# Exhibit A

1　THE WEISER LAW FIRM P.C.
　　KATHLEEN A. HERKENHOFF (168562)
2　12707 High Bluff Drive, Suite 200
　　San Diego, CA 92130
3　Telephone: 858/794-1441
　　Facsimile: 858/794-1450
4
　　Attorneys for Plaintiff
5

6

7

8

**FILED**
SAN MATEO COUNTY

MAR 2 8 2016

Clerk of the Superior Court

By _____
DEPUTY CLERK

File By Fax

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| M. JIM ELLIS, Individually and on Behalf of All Others Similarly Situated, ) ) | Case No. **CIV537896** |
| Plaintiff, ) ) ) | <u>CLASS ACTION</u> |
| vs. ) ) ) | SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 |
| NATERA, INC., MATTHEW RABINOWITZ, HERM ROSENMAN, JONATHAN SHEENA, ROELOF F. BOTHA, TODD COZZENS, EDWARD C. DRISCOLL, JR., JAMES I. HEALY, JOHN STEUART, SEQUOIA CAPITAL XII, LP, SC XII MANAGEMENT, LLC, LIGHTSPEED VENTURE PARTNERS VIII, LP, LIGHTSPEED ULTIMATE GENERAL PARTNER VIII, LTD., MORGAN STANLEY & CO. LLC, COWEN AND COMPANY, LLC, PIPER JAFFRAY & CO., ROBERT W. BAIRD & CO. INCORPORATED, WEDBUSH SECURITIES INC., and DOES 1-25, inclusive, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. ) ) | |

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Plaintiff, M. Jim Ellis, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through plaintiff's attorneys, which include, among other things, a review of Natera, Inc. ("Natera" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst and media reports and other commentary analysis, and information concerning Natera and the industry within which it operates. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a securities class action for violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Natera common stock in and/or traceable to the Company's July 2, 2015 initial public offering ("IPO") against (1) Natera; (2) certain of Natera's senior executives and directors who signed the June 1, 2015 Registration Statement issued in connection with Natera's IPO of 10.9 million shares of common stock (including exercise of the over-allotment) (the "Offering"); (3) certain controlling entities of Natera that owned approximately 31% of the Company's outstanding securities; and (4) each of the underwriters of the Offering. Plaintiff alleges that the Registration Statement and Prospectus incorporated therein (collectively, the "Registration Statement") issued in connection with the IPO contained materially incorrect or misleading statements and/or omitted material information that was required to be disclosed. Natera is strictly liable for such misstatements and omissions therefrom, as are the defendants who signed the Registration Statement, the underwriters and controlling entities and persons. Plaintiff expressly disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

2. According to its public filings, Natera is a leading genetic testing company that develops and commercializes non-invasive methods for analyzing DNA. Its primary product is Panorama, a non-invasive prenatal test ("NIPT"), which is considered, at least by the Company, to be the "most accurate NIPT commercially available in the United States." Panorama was launched in March of 2013.

3. Natera went public on July 2, 2015 at an IPO price of $18 per share. The Company's stock quickly traded up to close its first day of public trading at $22.74 per share. Natera's common stock is listed and trades on the NASDAQ stock exchange under the ticker symbol "NTRA."

4. Unfortunately for Natera's new investors, the offering materials falsely and misleadingly represented the state of Natera's business, including that Natera had experienced a nearly $20 million net loss in the Company's second quarter 2015 ("2Q15") – which had ended before the IPO – and which loss exceeded any other quarterly loss the Company had suffered by as much as 3700% since at least 2Q13 when Panorama was released. In addition, and contrary to how Natera's business was depicted in the Registration Statement, Natera saw Panorama tests accessioned[1] in which revenue was recognized flat-line at 28,000+ tests, and the percent of Panorama tests accessioned in which revenue was recognized in the same quarter had dramatically declined to a mere 47%. This was far below the percentage recognized in prior quarters—indicating bleak prospects for the Company's principal product—and what was portrayed in the Registration Statement and roadshow for the Offering.

5. At the time of this filing, Natera's stock has been trading in the range of $8.93-$9.36 per share, or *less than half the IPO price*, having plummeted in response to information reflecting the materialization of significant risks misrepresented and omitted from the Registration Statement as alleged herein.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to the California Constitution, Article VI, Section 10, and Section 22 of the Securities Act, 15 U.S.C.

---

[1] A test is accessioned when Natera receives the test, the relevant information about the test is entered into its computer system and the test sample is routed into the appropriate sample flow.

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

§77v. Section 22 of the Securities Act expressly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) refers to "covered class action[s] brought in any State court involving a covered security, as set forth in subsection (b);" and subsection (b) of §16, in turn, includes within its scope only covered class actions "based upon the statutory or common law of any State or subdivision thereof." *See* 15 U.S.C. §77p. This action only asserts federal law claims under §11, §12(a) and §15 of the Securities Act. *See* 15 U.S.C. §77k, §77l(a)(2), and §77o. Consequently, this action is not removable to federal court. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 643-44 (2006); *Madden v. Cowen & Co.*, 576 F.3d 957, 965 (9th Cir. 2009); *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1033-34 (9th Cir. 2008).

7. This Court has jurisdiction over each defendant named herein because each conducted business in, resided in, and/or was a citizen of California at the time of the Offering.

8. Venue is also proper in this Court because many of the acts complained of, including the preparation and dissemination of the materially inaccurate, misleading or incomplete Registration Statement and Prospectus (which were prepared by defendants, or with their participation, acquiescence, encouragement, cooperation and/or assistance), occurred in whole or in substantial part in this County. Natera's headquarters is in this County and eight additional defendants, including three individual defendants, reside or have offices in this County.

### PARTIES

9. Plaintiff M. Jim Ellis purchased shares of Natera common stock pursuant or traceable to the Offering, and was damaged thereby.

10. Defendant Natera is a Delaware corporation that maintains its principal executive offices in San Mateo County at 201 Industrial Road, San Carlos, California. Natera issued the securities sold in the IPO and is subject to liability as both an issuer and a control person. All statements and solicitation herein made by Natera's officers were on behalf of Natera. Natera designated numerous personnel on the working group for the IPO, including its Chief Executive

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Officer ("CEO"), Chief Technology Officer ("CTO"), and Chief Financial Officer ("CFO"), all of whom not only reviewed and approved the offering documents, but also traveled in a roadshow, and gave roadshow presentations according to a power point and talking points/script that was reviewed and approved by them and other Natera personnel. Natera's representatives at the roadshow pitched investors in the IPO through webcasts and meetings.

11.    Defendant Matthew Rabinowitz is a co-founder and President of Natera and has served as CEO since 2005 and as Chairman since May 2015. As one of three Natera executives in the IPO working group, Rabinowitz reviewed and approved, and participated in making, statements in the Registration Statement. He also reviewed, edited and approved the IPO's roadshow PowerPoint presentation and roadshow talking points and script, in addition to participating in making the false and misleading statements at the roadshow as Natera's CEO. Rabinowitz was motivated by the financial implications of an IPO for Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company. Immediately before the IPO, defendant Rabinowitz beneficially owned over 5.7 million Natera shares, providing him with 11.5% voting control after the IPO and over $104 million in marketable securities as of the close of the IPO. Those securities included over 1.2 million shares of Series A-1 Preferred Stock that automatically converted to Natera common stock on a one-for-one basis immediately prior to the close of the IPO. Those securities also included options for over 2.1 million underlying marketable common shares, with exercise prices between $0.55 and $5.39 per share, that vested in connection with or at or about the time of the IPO, and that were "in-the-money" with an intrinsic value of approximately $33 million as of the IPO's close.

12.    Defendant Jonathan Sheena is a co-founder of Natera and has served as CTO and a director since 2007. As one of three Natera executives in the IPO working group, Sheena reviewed and approved, and participated in making, statements in the Registration Statement. He also reviewed, edited and approved the IPO's roadshow PowerPoint presentation and roadshow talking points and script, in addition to participated in making the false and misleading statements at the roadshow as Natera's CTO. Sheena was motivated by the financial implications of an IPO for

Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company. Immediately before the IPO, defendant Sheena beneficially owned over 1.8 million Natera shares, providing him with 3.7% voting control after the IPO and with over $33.4 million in marketable securities as of the close of the IPO. Those securities included options for over 1.2 million underlying marketable common shares, with exercise prices between $0.44 and $2.65 per share, that were fully vested at or about the time of the IPO, and that were "in-the-money" with an intrinsic value of over $20 million as of the IPO's close.

13.     Defendant Herm Rosenman has served as Natera's CFO since February 2014. As one of three Natera executives in the IPO working group, Rosenman reviewed and approved, and participated in making, statements in the Registration Statement. He also reviewed, edited and approved the IPO's roadshow PowerPoint presentation and roadshow talking points and script, in addition to participated in making the false and misleading statements at the roadshow as Natera's CFO. Rosenman was motivated by the financial implications of an IPO for Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company. Immediately before the IPO, defendant Rosenman beneficially owned Natera options for over 138,000 underlying marketable common shares with exercise prices of $2.65 per share and an intrinsic value of over $2.1 million as of the IPO's close.

14.     Defendant Roelof F. Botha has been a Natera director since 2007. Defendant Botha is also Natera's Lead Independent Director and a member of Natera's Audit Committee and Nominating and Corporate Governance Committee. Immediately prior to the IPO, defendant Botha beneficially owned over 7.7 million, or approximately 20% of Natera's outstanding shares. Those shares largely consisted of Series A through Series E Preferred Stock, all of which converted to publicly tradable common stock on a one-for-one basis in connection with and immediately prior to the closing of the IPO. All of these shares, constituting over $139 million in marketable securities as a result of the IPO, were held by limited partnerships affiliated with the Sequoia Capital venture capital firm. Botha is affiliated with Sequoia Capital, and is a Managing Member of defendants SC XII Management, LLC, the general partner of defendants Sequoia Capital XII, LP and affiliated

limited partnerships, and has (and had at the time of the IPO) shared voting and dispositive power over the 7.7 million-plus shares held by those limited partnerships. Botha does business out of Sequoia Capital offices in San Mateo County.

15. Defendant Todd Cozzens has been a Natera director since 2011. Defendant Cozzens is also a member of Natera's Audit Committee and Compensation Committee. Cozzens was with Sequoia Capital, the venture capital firm holding approximately 20% of Natera's outstanding shares as of the IPO. Defendant Cozzens beneficially owned options for over 80,000 underlying marketable common shares with exercise prices of $1.38 per share and an intrinsic value of over 1.3 million as of the IPO's close.

16. Defendant Edward C. Driscoll, Jr. also known as "Ted Driscoll," has been a Natera director since 2007. Defendant Driscoll is also a member of Natera's Nominating and Corporate Governance Committee. Since 2006, defendant Driscoll has been with Claremont Creek Ventures, a venture capital firm that held and controlled approximately 19% of Natera's voting shares as of the IPO, and he sourced and led the financing of Natera pre-IPO. Driscoll resides in San Mateo County.

17. Defendant James I. Healy has been a Natera director since November 2014. Defendant Healy is also a member of the Compensation Committee and Nominating and Corporate Governance Committee. Immediately prior to the IPO, defendant Healy beneficially owned over 2.3 million, or approximately 6%, of Natera's outstanding shares. Those shares largely consisted of Series F Preferred Stock, all of which converted to publicly tradable common stock on a one-for-one basis in connection with and immediately prior to the closing of the IPO. All of these shares, constituting over $41 million in marketable securities as a result of the IPO, were held by limited partnerships affiliated with the Sofinnova venture capital firm. Defendant Healy is affiliated with Sofinnova, and is a managing member of each of Sofinnova Management VIII, L.L.C. and Sofinnova Management IX, L.L.C., the general partners of Sofinnova Venture Partners VIII, L.P. and Sofinnova Ventura Partners IX, L.P., respectively. Those limited partnerships each held

1 approximately 1.2 million shares of Natera stock as of the IPO, and Healy has (and had at the time

2 of the IPO) shared voting and dispositive power over those shares.

3     18. Defendant John Steuart has been a Natera director since June 2007. Defendant

4 Steuart is also a member of Natera's Audit Committee and Compensation Committee. Defendant

5 Steuart co-founded Claremont Creek Ventures, the venture capital firm that held approximately

6 19% of Natera's shares as of the IPO, and he was a Managing Director at that firm from 2004 to

7 July 2012.

8     19. The defendants named in ¶¶11-18 are sometimes referred to herein as the "Individual

9 Defendants." The Individual Defendants each participated in the preparation of and signed the

10 Registration Statement for the IPO. Their participation in the solicitation of the IPO, through

11 preparation and approval of the offering documents, was motivated by each of their financial

12 interests in the Company that were served by the IPO, and each of them financially benefitted from

13 the IPO in numerous ways, including substantially increasing the book value of Natera and the

14 Individual Defendants' shares and by providing a liquid market in which to sell their shares upon

15 the exercise of in-the-money options or otherwise. Indeed, the employee stock options held by the

16 defendants were valued in anticipation of an IPO. Natera's directors and executive officers and

17 their affiliates beneficially owned more than 34% of the Company's outstanding stock after the IPO.

18 In addition, the defendants referenced above in ¶¶11-13 are executives of Natera and approved and

19 participated in making statements to pitch potential investors in the roadshow to sell the IPO.

20 Natera and the Individual Defendants who signed the Registration Statement are strictly liable for

21 the false and misleading statements incorporated into the Registration Statement.

22     20. Defendant SC XII Management, LLC is part of a venture capital firm that invested in

23 Natera prior to the IPO and, through affiliated limited partnerships it controlled, including defendant

24 Sequoia Capital XII, LP, beneficially owned over 20% of the Company's shares as of the IPO.

25 (These two defendants are collectively referred to herein as "Sequoia Capital.") Defendant Botha is

26 a Managing Member of defendant SC XII Management, LLC, the general partner of defendant

27 Sequoia Capital XII, LP and affiliated limited partnerships, and has (and had at the time of the IPO)

28

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    shared voting and dispositive power over the 7.7 million-plus shares held by those limited

2    partnerships. By virtue of its 20% ownership of Natera and having two directors on Natera's board

3    of directors (defendants Botha and Cozzens) at the time of the IPO, defendant Sequoia Capital

4    effectively controlled Natera and caused it to conduct the IPO. Sequoia Capital has offices in San

5    Mateo County.

6    21.    Defendant Lightspeed Ultimate General Partner VIII, Ltd. is part of a venture capital

7    firm that invested in Natera prior to the IPO and, through affiliated limited partnerships it

8    controlled, including Defendant Lightspeed Venture Partners VIII, LP, beneficially owned over

9    10% of the Company's shares as of the IPO. (These two defendants are collectively referred to

10    herein as "Lightspeed.") Lightspeed's shares included Series A-1 and Series B through Series E

11    Preferred Stock, which all converted into publicly tradable Natera common stock on a one-for-one

12    basis in connections with and immediately prior to the close of the IPO. Defendant Lightspeed

13    Venture Partners VIII, LP held approximately 10% of the Company's shares as of the IPO and

14    defendant Lightspeed Ultimate General Partner VIII, LP had the power to, and did, direct the voting

15    of those Natera shares. By virtue of those holdings, Lightspeed effectively controlled Natera and

16    caused it to market and conduct the IPO. Lightspeed has offices in San Mateo County.

17    22.    The defendants named in ¶¶20-21 are sometimes collectively referred to herein as

18    the "Venture Capital Defendants." The Venture Capital Defendants are identified as related parties

19    to Natera in the Registration Statement. By virtue of their ownership of convertible preferred stock

20    and having directors on Natera's board of directors, the Venture Capital Defendants controlled

21    Natera.

22    23.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter

23    to Natera in connection with the IPO.

24    24.    Defendant Cowen and Company, LLC ("Cowen") served as an underwriter to Natera

25    in connection with the IPO.

26    25.    Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter to Natera

27    in connection with the IPO.

28

26. Defendant Robert W. Baird & Co. ("Baird") served as an underwriter to Natera in connection with the IPO.

27. Defendant Wedbush Securities Inc. ("Wedbush") served as an underwriter to Natera in connection with the IPO.

28. Defendants Morgan Stanley, Cowen, Piper Jaffray, Baird and Wedbush (collectively, the "Underwriter Defendants") are each financial services firms that acted as the lead and representative underwriters of Natera's IPO from their California-based offices, by helping to draft, approve the content of, and disseminate, the offering documents, by marketing the IPO, and by selling Natera's stock directly to investors per the underwriting syndicate allocation of 4,000,000, 2,150,000, 900,000, and 800,000 shares, respectively, not including the additional shares sold pursuant to the underwriting syndicate's "greenshoe" option. Morgan Stanley's offices are located in San Mateo County, and the remaining Underwriter Defendants have offices in San Francisco. Pursuant to the Securities Act, the Underwriter Defendants (and Natera where applicable) are liable for the false and misleading statements in the Registration Statements as follows:

(a)  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering's Registration Statement and Prospectus. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

(b)  The Underwriter Defendants are primarily investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and received approximately $13.7 million in fees, including underwriting discounts and commissions from the Offering and greenshoe. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Natera common stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they and representatives from Natera directly invited investors to meetings and webcasts for the purpose of encouraging investment in the IPO and pitched investors who purchased shares in the IPO. As the underwriters of the Offering, in addition to their lucrative underwriting fees, they also

1 received an option to purchase 1.5 million additional shares of common stock at the public offering

2 price, less underwriting discounts and commissions. They exercised the option to purchase 900,000

3 additional shares.

4       (c)     The Underwriter Defendants decided that in return for substantial fees and an

5 option to purchase 1.5 million shares, they were willing to underwrite and market Natera's common

6 stock in the Offering. The Underwriter Defendants met with potential investors and presented

7 highly favorable but materially incorrect and/or materially misleading information about the

8 Company, its business, products, plans, and financial prospects, and/or omitted to disclose material

9 information required to be disclosed under the federal securities laws and applicable regulations

10 promulgated thereunder.

11       (d)     Representatives of the Underwriter Defendants also assisted Natera and the

12 Individual Defendants in planning the Offering. They also purported to conduct an adequate and

13 reasonable investigation into the business, operations, products and plans of Natera, an undertaking

14 known as a "due diligence" investigation. During the course of their "due diligence," the

15 Underwriter Defendants had continual access to confidential corporate information concerning

16 Natera's business, financial condition, products, plans and prospects.

17       (e)     In addition to having access to internal Natera corporate documents, the

18 Underwriter Defendants and/or their agents, including their counsel, had access to Natera's lawyers,

19 management, directors and top executives to determine: (i) the strategy to best accomplish the

20 Offering; (ii) the terms of the Offering, including the price at which Natera common stock would be

21 sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Natera

22 would be made in the Registration Statement; and (v) what responses would be made to the SEC in

23 connection with its review of the Registration Statement. As a result of those constant contacts and

24 communications between the Underwriter Defendants' representatives and Natera's management

25 and top executives, at a minimum the Underwriter Defendants should have known of Natera's

26 undisclosed existing problems and plans, and the material misstatements and omissions contained in

27 the Registration Statement as detailed herein.

28

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    (f)    The Underwriter Defendants caused the Registration Statement to be filed

2  with the SEC and to be declared effective in connection with offers and sales of Natera shares

3  pursuant and/or traceable to the Offering and relevant offering materials, including to plaintiff and

4  the Class.

5    29.    The true names and capacities of defendants sued herein under California Code of

6  Civil Procedure §474 as Does 1 through 25, inclusive, are presently unknown to plaintiff who

7  therefore sues these defendants by such fictitious names.  Plaintiff will seek to amend this complaint

8  and include these Doe defendants' true names and capacities when they are ascertained.  Each of the

9  fictitiously named defendants is responsible in some manner for the conduct alleged herein and for

10  the injuries suffered by the Class.

11                              **FACTUAL BACKGROUND**

12  **Natera and Its Business**

13    30.    Natera, with its goal of changing the way people – both providers and patients –

14  respond to genetic disease, is a genetic testing company that develops and commercializes non-

15  invasive methods for analyzing DNA.  The Company aims to achieve this goal by providing the

16  most comprehensive and accurate genetic testing available.[2]

17    31.    The Company's revenue is generated, primarily, from the sale of Panorama, which is

18  its non-invasive prenatal test, or NIPT.  Panorama was launched in March 2013, and the Company

19  claims that it is the "most accurate NIPT commercially available in the United States."  Touting its

20  "specificity and sensitivity" to "reduce the need for unnecessary confirmatory invasive procedures,"

21  Panorama allegedly "lower[s] the total cost to the healthcare system of these procedures and limit[s]

22  _____

23  [2] Natera's approach, called massively multiplexed polymerase chain reaction ("mmPCR"),
combines proprietary molecular biology and computational techniques to measure genomic
variations in tiny amounts of DNA.  The Company has developed computationally intensive

24  algorithms that combine the data generated by mmPCR with the ever-expanding set of publicly
available data on genetic variations.  The Company has optimized these algorithms to enable

25  laboratories to run diagnostic tests locally and access Natera's algorithms in the cloud.  Natera's
tests detect copy number variations ("CNVs") and single nucleotide variants ("SNVs").  A CNV is

26  a genetic mutation in which relatively large regions of the genome had been deleted or duplicated.
An SNV is a mutation where a single base has changed.  When single-base changes are common in

27  the population, that position on the chromosome is called a single nucleotide polymorphism
("SNPs").

28

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

the resulting risk of spontaneous miscarriage." Accounting for 56% and 73% of Natera's revenue in 2013 and 2014, respectively, Panorama non-invasively screens – as early as nine weeks into a pregnancy – for fetal chromosomes abnormalities, including Down Syndrome, Edwards syndrome, Patau syndrome, Turner syndrome and triploidy.

32.     In 2014, the Company enhanced Panorama by adding the capability to screen for five of the most common genetic diseases caused by microdeletions.[3]  Unlike tests for fetal chromosomal abnormalities, which tend to be performed primarily in high-risk pregnancies, tests for microdeletions are performed in both high-risk pregnancies **and** average-risk pregnancies. Purportedly, with the expansion of Panorama's use in pregnancies classified as average risk, Natera was able to expand both its customer base and its revenue.

33.     In truth, Natera's growth depended in large part on expanding Panorama's use in average-risk pregnancies because the high-risk pregnancy genetic testing market was essentially saturated.  By 2016, for example, nearly 82% of high-risk pregnancy tests conducted had been at the hands of companies other than Natera, including competitors Sequenom, Illumina and LabCorp.  By contrast, during the same period, Natera accounted for nearly 81% of the total number of average-risk pregnancies tested, albeit the average-risk market had barely been tapped.[4]

34.     In addition, the Company acknowledged that its "ability to increase [its] revenues will depend on [its] ability to further penetrate the domestic and international markets and, in particular, generate sales through [its] direct sales force, offer additional tests, obtain reimbursement from additional third-party payers and increase [its] reimbursement rate for tests performed."

35.     Counting only those tests that Natera receives after the relevant information about the test is entered into its computer system and the test sample is routed into the appropriate sample

---

[3] Microdeletions are missing sub-chromosomal pieces of DNA, which can have serious health implications depending on the location of the deletion.  According to data published in *Prenatal Diagnosis and American Journal of Obstetrics & Gynecology*, microdeletions are more common than Down syndrome for women younger than approximately 32 years of age.

[4] Percentages calculated based on industry checks and company projections.

1  flow (a/k/a "accessioned"), Natera uses the number of tests accessioned as a key indicator of the

2  Company's business performance.[5]

3       36.    To increase the number of tests accessioned, Natera markets and sells its tests to

4  customers, including independent laboratories, national and regional reference laboratories, medical

5  centers and physician practices, both through its sales force and its laboratory distributors.

6  Moreover, the Company directly bills clinics, laboratory distribution partners, patients and

7  insurance payers for the tests the Company performs. In cases where Natera bills laboratory

8  distributor partners, its partners in turn bill clinics, patients and insurance payers. Notably, insurers

9  reimburse for NIPT procedures in high-risk pregnancies based on positive coverage decisions,

10 which means that the insurer has determined that NIPT in general is medically necessary for this

11 category of patient.

12      37.    The Company attributed its commercial success and future growth prospects in part

13 to its independent direct sales force, which, at the time of the IPO, Natera stated it was continuing to

14 expand. Indeed, Natera stated that "[w]e can offer all of our products through our direct sales force

15 and at a higher gross margin percentage than when we service customers through a partner." Natera

16 also stated that the "percentage of our overall accessioned tests generated through the higher margin

17 U.S. direct sales force increased from approximately 25% in 2013 to approximately 44% in 2014,

18 and to approximately 60% for the three months ended March 31, 2015."

19 **Natera's Ownership and Compensation Plans**

20      38.    Prior to its IPO, Natera's directors and stockholders approved a 1-for-1.63 reverse

21 split of its capital stock on June 19, 2015. Just before the Offering, the Company had

22 approximately 38.4 million shares of common stock outstanding. As of July 31, 2015, there were

23 49.9 million shares of stock outstanding, 76.9% of which was owned by existing stockholders

24 before the IPO, and 23.1% of which was owned by new investors.

25

26

27 [5] Over 65,000 and 185,000 Panorama tests were accessioned during the years ended December 31,
   2013 and 2014, respectively, and over 55,000 Panorama tests were accessioned during 1Q15.

28

- 13 -

39. Prior to its IPO, none of Natera's directors were compensated for service as a member of Natera's board of directors. After the IPO, the directors were each eligible to receive compensation for being a board member ($35,000) and either a chair (with retainers ranging from $10,000 – $15,000) or member (with retainers ranging from $5,000 to $7,500) of one of the board's committees.

40. In addition to the compensation identified in ¶39, each director, after the IPO, and after voted on at Natera's annual meeting of stockholders beginning in 2016, will be eligible to receive an annual stock option grant of 11,169 shares.

## MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENT

41. On July 2, 2015, Natera conducted its IPO, selling 10.9 million shares at $18 per share and raising approximately $178 million in proceeds, including the underwriters' exercise of the overallotment option.

42. In the Registration Statement, the Company reported that its revenue for fiscal year 2014 was $159.2 million compared to $55.1 million for the previous year. This growth represented a 188.7% change. Additionally, the Company's net loss for fiscal year 2014 was $5.1 million compared to $37.1 million in 2013, representing a 86% change.

43. Indeed, Natera portrayed itself as a "rapidly growing diagnostics company" with huge year-over-year increases in revenues. The Company represented that its revenues were in a "quarterly" growth "trend" and that its "rapid growth of revenues is attributed to reimbursement from increased volumes of …[the Company's primary product] Panorama."

44. To create the impression that gross margins were high and increasing, the Registration Statement also included such statements as "Panorama's test performance has allowed us to command a price premium" while achieving a high volume of accessions, "increase[s in] the number of test distributed … in the third and fourth quarters of 2014 resulted in a higher average payment per test," "average costs per unit decreased" in 2014, and direct sales force sales were "at a higher gross margin percentage" and had increased significantly.

45. Additionally, the Registration Statement compared first quarter 2015 ("1Q15") and first quarter 2014 ("1Q14") revenues and net losses. The Company reported that 1Q15 revenues were $47.4 million compared to $27.2 million in 1Q14, a 73.8% change, and 1Q15 net losses of $10 million compared to $9.6 million in 1Q14.

46. The Registration Statement characterized the increase in net loss in 1Q15 as not "a reliable indicator of our future results," suggesting instead that it was merely due to "new CPT codes" that came into effect at the beginning of the quarter and an associated "delay in revenue recognition," adding that "not all payers may implement this code in a timely fashion."

47. In truth, however, and unbeknownst to Plaintiff and those similarly situated at the time, the statements and the reported financial results mentioned above, failed to accurately depict the financial condition of the Company. Instead, the statements made, falsely and misleadingly omitted the fact that the Company's primary revenue-generating product, Panorama, had flat-lined, and that Natera was contracting at lower prices, thereby eating into its revenues and gross margin. Moreover, the statements failed to note that then-current (second quarter) results were substantially worse.

48. Despite increasing 25.8% from the previous year, revenues were actually soft, and the Company faced a huge net loss of $19.6 million in the second quarter of 2015 ("2Q15"), which exceeded any other quarterly loss the Company had suffered by between almost 100% and 3700% since at least the second quarter of 2013 ("2Q13"), when Panorama was released:

|  | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 |
|---|---|---|---|---|---|---|---|---|---|
| Net Loss | ($8.8m) | ($5.5m) | ($4.7m) | ($9.6m) | ($514k) | ($3.7m) | ($1.2m) | ($10m) | ($19.6m) |

49. Inaccurately, the Registration Statement also portrayed Panorama as being in a significant growth "trend," stating that large increases in revenues were "primarily due to increased sales of Panorama," and representing that quarterly and annual year-over-year increases in Panorama tests accessioned were increasing revenue greatly. Specifically, the Registration Statement included the following figures:

|  | 2013 | 2014 | 1Q14 | 1Q15 |
|---|---|---|---|---|

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

| Panorama Tests Accessioned | 65,000+ | 185,000+ | 38,000+ | 55,000+ |
| --- | --- | --- | --- | --- |

50.     The statements above were false and misleading and omitted material information as Panorama tests accessioned in which revenue was recognized had already flat-lined.  In fact, of the 58,000+ Panorama tests accessioned, only 28,000+ tests were recognized as part of the Company's revenue.  Further, the percent of Panorama tests accessioned in which revenue was recognized in the same quarter had dramatically declined to a mere 47%, as third-party payers were refusing to reimburse patients for Panorama adequately and doctors were not recommending it.

51.     The Registration Statement referred to numbers of pages of generalized "risks and uncertainties" that purportedly were then not occurring, but if they "actually occur[red]," "could … materially and adversely affect []" Natera.  Specifically, the Registration Statements included the following: "our quarterly results *may* fluctuate significantly, which *could* adversely impact the value of our stock," "*if* our efforts to further increase the use and adoption of Panorama … do not succeed, our business will be harmed," and the "NIPT market *may* not grow as we expect, and NIPTs *may* not gain acceptance for use in the average-risk pregnancy population, which would limit the market for Panorama."

52.     In actuality, these statements were materially false and misleading and omitted material then-current factual information.  Specifically, Natera was sitting on then-current drab results from operations and constrained guidance resulting therefrom that would **certainly** adversely impact Natera's stock value, and indeed that was due in part to the flat-lining of Panorama test accessions, price concessions, and factors limiting the market for Panorama, including third-party payer refusals and doctor behavior.

53.     The Registration Statement also asserted as a mere "uncertaint[y]" that "third-party payers, such as commercial insurance companies and government insurance programs, *may* decide not to reimburse for Panorama, *may* not reimburse for uses of Panorama for the average-risk pregnancy population or for the screening of microdeletions, or *may* set amounts of such reimbursements at prices that do not allow us to cover our expenses."  It also stated that "*[i]f* we are unable to expand third-party payer coverage and reimbursement for Panorama and our other tests, *if*

1  third-party payers withdraw coverage or provide lower levels of reimbursement due to changing

2  policies, billing complexities or other factors, or *if* we are required to refund any reimbursements

3  already received, our revenues and results of operations would be adversely affected."

4      54.    Alas, these statements were also false and misleading and omitted material

5  information because the "possible" future had already come to fruition. Third-party payers were

6  already reducing reimbursement amounts and prices. And, even those third-party payers that were

7  contracting when coverage was previously out-of-network, they were doing so at significantly

8  reduced prices. As reflected in the then-current (but not revealed) 2Q15 results, Natera could not

9  offset this with expanded coverage and reimbursement, causing the Company to face alarming

10  financial results.

11      55.    Similarly, the Registration Statement stated insurance coverage was "expanding,"

12  suggesting that "results from operations and prospects could be materially and adversely affected"

13  "[*i*]*f* we are unable to obtain or maintain adequate reimbursement coverage from third-party payers"

14  or "*if* reimbursement coverage is unavailable or reimbursement amounts are inadequate," causing

15  "physicians [to be] reluctant to order the use of our tests" in the future. Likewise, "*[i]f* adequate

16  third-party reimbursement is unavailable, we *may* not be able to maintain price levels," "[*i*]*f* we are

17  successful in entering into additional contractual arrangements with commercial third-party payers

18  ... the amount of overall reimbursement we receive may decrease *if*, as we would expect, we are

19  reimbursed less money per test at a contracted rate than at a non-contracted rate, which *could* have a

20  negative impact on our revenue," "*if* we do have written agreements regarding reimbursement ...

21  those agreements are not guarantees or reimbursement coverage in an adequate amount," and

22  "third-party payers *may* review and adjust the rate of reimbursement." Additionally, the

23  Registration Statement suggested that "not all payers may implement" a new CPT code "in a timely

24  fashion, and reimbursement *may* be less than we have received in the past."

25      56.    Again, all of the statements above were false and misleading and omitted material

26  information then known by the Company and the defendants, but not known by Plaintiff or the other

27  future new shareholders of Natera. In truth, these events were already occurring and already having

28

a significant negative impact on the Company's revenues, margins and prospects. For example, there were payers implementing the new CPT code in such a way that reimbursement **was** in fact less than what Natera had been historically receiving. As a result, Natera's prices were already dropping due to contracts with third-party payers and third-party payer reimbursement coverages, amounts and negotiated price levels.

57. This misrepresented and omitted information by defendants in the Registration Statement was material. Even analysts employed by the Underwriter Defendants voiced surprise at the decline in gross margins for the quarter that ended over one week before the Company's IPO closed. As the true facts began to seep into the market, just weeks after the IPO, analysts made comments such as: "*Surprisingly [gross margins] were flattish despite significantly more NIPTs and sequentially down sales*". (Emphasis added). Another analyst underscored how it amounted to "*a pretty big step down* in the second half in terms of gross margin."

58. Suggesting that other companies were more forthcoming about reimbursement levels, securities analysts questioned the Company's executives during Natera's first earning call. In response, Natera's executives finally admitted that Natera had "been *under pressure since the coding change, [b]eginning in January of 2015...*" Rather than take the opportunity to be honest about the actual financial condition and business prospects of the Company, Natera executives tried to downplay the significance of the Company's gross margin declines, emphasizing volume increases and efforts to decrease cost of goods sold. Eventually, they admitted that margin declines were more significant than they had previously suggested.

59. Likewise, the Company ultimately revealed it was lowering its top-end revenue guidance, announcing that future growth was not as telegraphed in the IPO, and that revenue and margins were being affected by third-party payer contract reimbursement levels and pricing declines. On this news, investors reacted negatively.

60. Omitting the known trends and facts that had already had a materially unfavorable impact on Natera's revenues and net losses at the time of the IPO, Natera's Registration Statement, including the Prospectus incorporated therein, presented a highly positive – albeit materially false

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1 and misleading – picture of the Company's business, performance, prospects and products. Such
2 failure on the part of the Defendants to address these shortcomings and falsehoods, violates Item
3 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii), requiring that the materials incorporated in a
4 registration statement disclose all "known trends or uncertainties" reasonably expected to have a
5 material, unfavorable impact on a company's operations.

6     61.    By the close of the Company's IPO, the Company and the Underwriter Defendants,
7 who sold 10.9 million shares of Natera common stock to the public at $18 per share (including
8 900,000 shares of common stock pursuant to the Underwriter Defendants' exercise of the over-
9 allotment option) raised $178.5 million in gross proceeds for the Company. Undeniably, the IPO
10 was a success for the Company and the Underwriter Defendants.

11     62.    Yet, at the time of filing this action, Natera stock was trading in a range of $8.93-
12 $9.36 per share, or less than **half of the IPO price**, having plummeted in response to information
13 reflecting the materialization of significant risks misrepresented and omitted from the Registration
14 Statement as alleged herein, and to the partial revelation of material facts previously omitted and
15 misrepresented as alleged herein.

16 **CLASS REPRESENTATION ALLEGATIONS**

17     63.    Plaintiff brings this action on his own behalf and as a class action, on behalf of all
18 stockholders of Natera, except Defendants herein and any person, firm, trust, corporation, or other
19 entity related to or affiliated with any of the Defendants, who are threatened with injury arising
20 from Defendants' actions as is described more fully below (the "Class").

21     64.    This action is properly maintainable as a class action.

22     65.    The Class is so numerous that joinder of all members is impracticable . According
23 to the Company's most recent Form 10-Q, filed with the SEC for the period ending September 30,
24 2015, there were more than 49,996,000 shares of Natera common stock outstanding as of October
25 30, 2015.

26     66.    While the exact number of Class members is unknown to Plaintiff at this time and
27 can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of
28

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    thousands of members of the proposed Class geographically dispersed across the country. The

2    members of the proposed Class may be identified from records maintained by Natera or its transfer

3    agent and may be notified of the pendency of this action by mail, using customary forms of notice

4    that are commonly used in securities class actions.

5            67.    Plaintiff's claims are typical of the claims of the other members of the Class and

6    Plaintiff does not have any interests adverse to the Class.

7            68.    There are questions of law and fact which are common to the Class and which

8    predominate over questions affecting any individual Class member.    The common questions

9    include, *inter alia*, the following:

10           (a)    Whether the federal securities laws were violated by Defendants' acts as

11   alleged herein;

12           (b)    Whether the Registration Statement and Prospectus contained materially false

13   and misleading statements and omissions; and

14           (c)    To what extent Plaintiff and members of the Class have sustained damages

15   and the proper measure of damage.

16           69.    Plaintiff is an adequate representative of the Class, has retained competent counsel

17   experienced in litigation of this nature, and will fairly and adequately protect the interests of the

18   Class.

19           70.    The prosecution of separate actions by individual members of the Class would create

20   a risk of inconsistent or varying adjudications with respect to individual members of the Class

21   which would establish incompatible standards of conduct for the party opposing the Class.

22           71.    Plaintiff anticipates that there will be no difficulty in the management of this

23   litigation as a class action.    A class action is superior to other available methods for the fair and

24   efficient adjudication of this controversy.

25           72.    Defendants have acted on grounds generally applicable to the Class with respect to

26   the matters complained of herein, thereby making appropriate the relief sought herein with respect

27   to the Class as a whole.

28

SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

## FIRST CAUSE OF ACTION

### Violations of §11 of the Securities Act
### Against All Defendants Except the Venture Capital Defendants

73.  Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

74.  This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except the Venture Capital Defendants. This is a non-fraud cause of action. Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

75.  The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

76.  The defendants named in the Cause of Action are strictly liable to plaintiff and the Class for the misstatements and omissions.

77.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

78.  By reason of the conduct alleged herein, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

79.  Plaintiff acquired Natera common stock pursuant or traceable to the IPO.

80.  Plaintiff and the Class have sustained damages. The value of Natera common stock has declined substantially subsequent to and due to these defendants' violations.

81.  At the time of their purchases of Natera common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action. Less than

three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violations of §12(a)(2) of the Securities Act
### Against All Defendants Except the Venture Capital Defendants

82.     Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

83.     This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), against all defendants except the Venture Capital Defendants. This is a non-fraud cause of action. Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent. The defendants named in this Cause of Action sold Natera stock or were directly involved in the sale of Natera stock by approving statements made in the Prospectus and roadshow that encouraged investment in the IPO, and in so doing were motivated by a desire to serve their own financial interests or the interests of the pre-IPO owners of Natera stock.

84.     By means of the defective Prospectus and other conduct alleged herein, Natera, the Individual Defendants, and the Underwriter Defendants promoted and sold Natera common stock to plaintiff and other members of the Class. The defendants named in this Cause of Action were sellers, offerors and/or solicitors of purchasers of the Natera stock offered pursuant to the Offering. Defendants issued, caused to be issued and/or signed the Registration Statement issued in connection with the Offering. The Prospectus was used to induce investors, such as Plaintiff and the other members of the Class, to purchase Natera shares.

85.     The Prospectus and roadshow communications contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above. The defendants named in this Cause of Action owed Plaintiff and the other members of the Class who purchased Natera common stock pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements

1  were true and that there was no omission to state a material fact required to be stated in order to
2  make the statement contained therein not misleading. These defendants, in the exercise of
3  reasonable care, should have known of the misstatements and omissions contained in the Prospectus
4  as set forth above.

5      86.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known,
6  of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Natera
7  common stock.

8      87.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the
9  Securities Act. As a direct and proximate result of such violation, Plaintiff and the other members
10 of the Class who purchased Natera common stock pursuant to the Prospectus sustained substantial
11 damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other
12 members of the Class who hold the common stock issued pursuant to the Prospectus have the right
13 to rescind and recover the consideration paid for their shares, and hereby tender their common stock
14 to defendants sued herein. Class members who have sold their common stock seek damages to the
15 extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violations of §15 of the Securities Act**
**Against All Defendants Except the Underwriter Defendants**

19     88.    Plaintiff repeats and re-alleges each and every allegation contained above, as if fully
20 set forth herein.

21     89.    This Cause of Action is brought pursuant to §15 of the Securities Act, against all
22 defendants except the Underwriter Defendants.

23     90.    The Individual Defendants were each control persons of Natera by virtue of their
24 positions as directors and/or senior officers of Natera. By virtue of pre-IPO shareholder
25 agreements, their stock holdings, and having designees on the Natera board of directors at the time
26 of the IPO, the Venture Capital Defendants had the power to (and did) control Natera. The
27 Individual Defendants each had a series of direct and/or indirect business and/or personal

28

relationships with other directors and/or officers and/or major shareholders of Natera. Sequoia Capital controlled its designees on Natera's board, Botha and Cozzens, who are defendants named herein. Those designees, Botha and Cozzens, and Healy, were controlled by Sequoia Capital and Lightspeed, respectively. The Company controlled the Individual Defendants and all of Natera's employees.

91. The Venture Capital Defendants had a financial interest in taking the Company's stock public to increase the holding value and marketability of their entities and their investments in Natera. Natera, the Venture Capital Defendants and the Individual Defendants each were critical to effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the IPO, and having otherwise directed through their authority the process leading to execution of the IPO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as a Class representative under California Rule of Court 3.764 and California Code of Civil Procedure §382, and Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class rescission or a rescissory measure of damages on their §12(a)(2) claims;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorney's fees, expert witness fees, and other costs and disbursements; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

- 24 -

DATED: March 23, 2016

THE WEISER LAW FIRM, P.C.

_Kathleen A Herkenhoff_

KATHLEEN A. HERKENHOFF
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile: 858/794-1450

THE WEISER LAW FIRM, P.C.

ROBERT B. WEISER
CHRISTOPHER L. NELSON
JAMES M . FICARO
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: 610/225-2677
Facsimile: 610-408-8062

**RYAN & MANISKAS, LLP**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
(484) 588-5516

Attorneys for Plaintiff

- 25 -

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**FILED**
**SAN MATEO COUNTY**

MAR 23 2016

Clerk of the Superior Court

By _____
DEPUTY CLERK

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

NATERA, INC., MATTHEW RABINOWITZ,
(see attachment page for additional defendants)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

M. JIM ELLIS, Individually and on Behalf of All Others Similarly Situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* SAN MATEO<br><br>400 COUNTY CENTER<br>REDWOOD CITY, CA 94063 | CASE NUMBER:<br>*(Número del Caso):* CIV537896 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kathleen A. Herkenhoff, 12707 High Bluff Drive # 200, San Diego, CA 92130, Phone: 858-794-1441

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* MAR 23 2016 | Clerk, by<br>RODINA M. CATALANO *(Secretario)* | _____ | , Deputy<br>*(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

American LegalNet, Inc.
www.FormsWorkflow.com

File By Fax

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| M. Jim Ellis, v Natera, Inc., et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

HERM ROSENMAN, JONATHAN SHEENA, ROELOF F. BOTHA, TODD COZZENS, EDWARD C. DRISCOLL, JR., JAMES I. HEALY, JOHN STEUART, SEQUOIA CAPITAL XII, LP, SC XII MANAGEMENT, LLC, LIGHTSPEED VENTURE PARTNERS VIII, LP, LIGHTSPEED ULTIMATE GENERAL PARTNER VIII, LTD., MORGAN STANLEY & CO . LLC, COWEN AND COMPANY, LLC, PIPER JAFFRAY & CO., ROBERT W . BAIRD & CO. INCORPORATED, WEDBUSH SECURITIES INC., and DOES 1-25, inclusive,

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| KATHLEEN A. HERKENHOFF (168562)<br>THE WEISER LAW FIRM P.C.<br>12707 High Bluff Drive, Suite 200<br>San Diego, CA 92130<br>TELEPHONE NO.: 858/794-1441   FAX NO.: 858/794-1450<br>ATTORNEY FOR *(Name):* Plaintiff, M. Jim Ellis | **F I L E D**<br>SAN MATEO COUNTY<br><br>MAR 2 [?] 2016<br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, Ca 94063
BRANCH NAME:

CASE NAME:
M. Jim Ellis v Natera, Inc., et al

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CIV537896 |
|---|---|---|
| [✓] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] **Counter**   [ ] **Joinder**<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[✓] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify):* 3
5. This case [✓] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 03/23/2016
Kathleen A. Herkenhoff
_____
(TYPE OR PRINT NAME)   ▶ *Kathleen A Herkenhoff*
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

American LegalNet, Inc.
www.FormsWorkflow.com

*File By Fax*

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach–Seller Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award (*not unpaid taxes*)
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint Case (*non-tort/non-complex*)
  Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

File By Fax

| Attorney or Party without Attorney (Name/Address) | FOR COURT USE ONLY |
|---|---|
| Kathleen A. Herkenhoff, Esq.<br>THE WEISER LAW FIRM, P.C.<br>12707 High Bluff Drive, # 200, San Diego, CA 92130<br>Telephone: 858-794-1441<br>State Bar No.:  168562<br>Attorney for:   Plaintiff, M. Jim Ellis | **FILED**<br>SAN MATEO COUNTY<br><br>MAR 2 3 2016<br><br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |
| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN MATEO<br>400 COUNTY CENTER<br>REDWOOD CITY, CA  94063 | |
| Plaintiff<br>M. JIM ELLIS | |
| Defendant<br>NATERA, INC, et al. | |
| **Certificate Re Complex Case Designation** | Case Number<br>C I V 5 3 7 8 9 6 |

## This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

1.   In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

☑ Box 1 – Case type that is best described as being [or not being] provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

☑ Box 2 – Complex [or not complex] due to factors requiring exceptional judicial management

☑ Box 5 – Is [~~or is not~~] a class action suit.

2.   This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions

CV-59 [Rev. 1/06]                                              www.sanmateocourt.org

pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision]:

This case is provisionally complex as it involves securities claims

and it is being designated as a complex action

because there are a large numbers of parties involved

and due to the complexity of the legal issues.

*(attach additional pages if necessary)*

3.  Based on the above-stated supporting information, there is a reasonable basis for the complex case designation or counter-designation [or noncomplex case counter-designation] being made in the attached Civil Case Cover Sheet.

*****

I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct and that I make this certification subject to the applicable provisions of California Code of Civil Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San Mateo County Superior Court Local Rules, Local Rule 2.30.

Dated: 03/23/2016

Kathleen A. Herkenhoff
[Type or Print Name]

[Signature of Party or Attorney For Party]



# Superior Court of California
## County of San Mateo
### Civil Department
### 400 County Center
### Redwood City, CA 94063-1655
### (650) 261-5100
### www.sanmateocourt.org



| | |
|---|---|
| M JIM ELLIS<br>Plaintiff(s)<br>vs.<br>NATERA, INC<br>Defendant(s) | **Notice of Complex Case Status Conference**<br><br>Case No.: CIV 537896      Date: **05/24/16**<br><br>Time: **9:00 AM**<br><br>**Dept. 11** |

Title:  M JIM ELLIS VS NATERA, INC, ETAL

You are hereby given notice of your Complex Case Status Conference. The date, time and department have been written above. At this conference, the Presiding Judge will decide whether this action is a complex case within the meaning of California Rules of Court ("CRC"), Rule 3.400, subdivision (a) and whether it should be assigned to a single judge for all purposes.

1.  In accordance with applicable **San Mateo County Local Rule 2.30**, you are hereby ordered to:
    a.  **Serve** copies of this notice, your Civil Case Cover Sheet, and your Certificate Re: Complex Case Designation on all named parties in this action no later than service of your first appearance pleadings
    b.  **Give reasonable notice** of the Complex Case Status Conference to all named parties in this action, even if they have not yet made a first appearance or been formally served with the documents listed in subdivision (a). Such notice shall be given in the same manner as required for an ex parte application pursuant to CRC 3.1203.

> **2.  If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order To Show Cause hearing will be at the same time as the Complex Case Status Conference. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.**

3.  An action is provisionally a complex case if it involves one or more of the following types of claims: (1) antitrust or trade regulation claims; (2) construction defect claims involving many parties or structures; (3) securities claims or investment losses involving many parties; (4) environmental or toxic tort claims involving many parties; (5) claims involving massive torts; (6) claims involving class actions; or (7) insurance coverage claims arising out of any of the claims listed in subdivisions (1) through (6). The Court shall treat a provisionally complex action as a complex case until the Presiding Judge has the opportunity to decide whether the action meets the definition in CRC 3.400(a).

4.  Any party who files either a Civil Case Cover Sheet (pursuant to CRC 3.401) or a counter or joinder Civil Case Cover Sheet (pursuant to CRC 3.402, subdivision (b) or (c)), designating an action as a complex case in Items 1, 2 and/or 5, must also file an accompanying Certificate Re: Complex Case Designation in the form prescribed by the Court. The certificate must include supporting information showing a reasonable basis for the complex case designation being sought. Such supporting information may include, without limitation, a brief

description of the following factors as they pertain to the particular action: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision.

For further information regarding case management policies and procedures, see the court website at www.sanmateocourt.org

* Telephonic appearances at Complex Case Status Conference are available by contacting CourtCall, LLC, an independent vendor, at least 5 business days prior to the scheduled conference.

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that I am the clerk of this Court, not a party to this cause; that I served a copy of this notice on the below date, by placing a copy thereof in separate sealed envelopes addressed to the address shown by the records of this Court, and by then sealing said envelopes and depositing same, with postage fully pre-paid thereon, in the United States Mail at Redwood City, California.

Date: 03/24/16

Rodina M. Catalano,
Court Executive Officer/Clerk

By: UNALOTO FINAU
Deputy Clerk

Copies mailed to:

KATHLEEN A. HERKENHOFF
12707 HIGH BLUFF DRIVE
SUITE 200
SAN DIEGO CA 92130

## NOTICE OF CASE MANAGEMENT CONFERENCE

*Ellis*

vs.

*Anteva Inc*

**FILED**
**SAN MATEO COUNTY**

MAR 23 2016

Clerk of the Superior Court
By _____ Deputy
DEPUTY CLERK

Case No: **CIV537896**

Date: **6/10/16**

Time 9:00 a.m.

--on Tuesday & Thursday
--on Wednesday & Friday

Dept. **21**

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1. In accordance with applicable California Rules of the Court and local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:
   a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 201.7).
   b) Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.
   c) File and serve a completed Case Management Statement at least 15-days before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.
   d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than 30-days before the date set for the Case Management Conference.

2. If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.

3. Continuances of Case Management Conferences are highly disfavored unless good cause is shown.

4. Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10-days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.

5. If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes," etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.

6. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

7. The Case Management judge will issue orders at the conclusion of the conference that may include:
   a) Referring parties to voluntary ADR and setting an ADR completion date;
   b) Dismissing or severing claims or parties;
   c) Setting a trial date.

8. The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at: www.sanmateocourt.org

*Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).*